United States District Court
for the District of Rhode Island
(1 Exchange Terrace, Providence, RI)

FILED

2013 MAR 20 A II: 11

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

CA 13 - 181M

Ronald Satish Emrit
    Plaintiff (Pro Se)

                                )  C.A. No. _____
                                )
                                )
        v.                      )  PLAINTIFF
                                )  DEMANDS
                                )  TRIAL BY JURY
Universal Music Group, Inc. (UMG),  )
Recording Industry Association  )
of America (CRIAA), Federal     )
Communications Commission (FCC),  )
& Clear Channel Communications  )

# COMPLAINT

Plaintiff, who comes now before this court pro se and filing a motion "in forma pauperis" without an attorney, for his Complaint and Jury Demand against Defendants, states, avers, and alleges as follows:

# I. INTRODUCTORY STATEMENT

1.) This is an action alleging that Defendants either acting separately or in collusion with one another have either defamed the Plaintiff with an action of libel and/or slander through "word of mouth" and/or written publication and/or have committed



one of the other dignitary torts including but not limited to invasion of privacy, "false light," and/or misappropriation of likeness which have caused the Plaintiff to suffer from a damage to reputation in the music business in addition to a loss of pecuniary wages which call for expectation, reliance, and restitution damages as well as punitive and compensatory damages.

2.) Because the Plaintiff is neither a public figure or a limited public figure, there is no need for the standard of "actual malice" which places the burden of proof/persuasion squarely on the Plaintiff to show a "knowing falsity and reckless disregard for the truth" consistent with *N.Y. Times v. Sullivan* and *Hustler v. Falwell* (parody)

3.) Because the Plaintiff is a private figure, there is only a requirement of the showing of negligence in that the Universal Music Group (UMG) acted negligently in defaming the Plaintiff and essentially "black-listing" Plaintiff from ever getting a record deal from a major record label, distribution conglomerate, publishing company and/or one of its subsidiaries.

4.) Kevin Flanagan of Kroll, Inc is either an independent contractor of or an agent of the Universal Music Group, Inc. (UMG) and the Universal Music Group (UMG) is therefore

bound by the actions of Kevin Flanagan in contract law since he has the actual, apparent, express and/or implied authority to bind the Universal Music Group (UMG) to contract law pursuant to the laws of agency and partnership.

5.) With regards to tort law, the Universal Music Group (UMG) is bound by the actions of Kevin Flanagan pursuant to the doctrine of respondeat superior/vicarious liability unless Kevin Flanagan entered into a frolic and detour.

6.) Kevin Flanagan committed the tort of "malicious prosecution" and may have entered into a conspiracy to commit malicious prosecution with the Universal Music Group (UMG) upon accusing the Plaintiff of "aggravated harassment" after Plaintiff had officially been named as the publicist for one of Universal's up-and-coming rappers, ie "Glory" from Rochester, NY who was getting airplay for a song called "Home with Her."

7.) Kevin Flanagan (representing the Universal Music Group) also may have committed the tortious interference w/ business relations in addition to the tortious interference w/ contracts by issuing Plaintiff (Ronald Satish Emrit) a "cease and desist order" to refrain from contacting Jim Urie and Sylvia Rhone at Universal when Glory's manager himself (A.J. Burton of Hope, AR.) asked the Plain-

tiff (Ronald Satish Emrit) to be the publicist for Glory and to handle all of his public relations work.

8.) Since this "cease and desist order" was issued by Kevin Flanagan on behalf of the Universal Music Group (UMG), the careers of both Glory and the Plaintiff Ronald Satish Emrit have been adversely affected giving rise to a cause of action for the tortious interference w/ business relations/contracts and the damages have come in the form of a loss of pecuniary wages and Plaintiff seeks punitive, compensatory, and treble damages.

9.) The Recording Industry Association of America (RIAA), the second named defendant, has the standing, causation, and redressability to represent the four major record labels and/or distribution conglomerates, i.e. Universal Music Group (UMG), Sony BMG, Warner Music Group, Inc. (Warner/Elektra/Atlantic), and EMI (overseeing Capital and Virgin Records.)

10.) As the fiduciary, agent, and/or representative of the Universal Music Group, Inc. (UMG), the RIAA has the task of addressing all justiciable cases or controversies on behalf of the Universal Music Group, Inc. (UMG) so long as these cases and/or controversies are ripe and not moot.

11.) The RIAA, as representative of the four major record labels, allows the Universal Music Group (UMG) and the other three major labels to "get away with" the criminal practice of "payola" which involves a complicated and sophisticated scheme of bribery, extortion, corruption, money laundering, prostitution, solicitation of prostitution, racketeering (RICO violations), mail fraud, wire fraud, tax fraud, and conspiracy.

12.) The Federal Communications Commission (FCC), the third named defendant, is the regulatory agency of the federal government which is responsible for monitoring and assessing penalties for "payola" violations; former N.Y. attorney general Eliot Spitzer entered into a settlement w/ the Universal Music Group, Inc. (UMG) for "payola" violations of N.Y. state law.

13.) In essence, the FCC has been negligent because this organization has turned a "blind eye" to "payola" practices committed by radio stations and the four major record labels, i.e. Universal (UMG), Warner Music Group, Inc. (W/E/A), Sony BMG, and EMI (overseeing Capitol and Virgin); the FCC has a duty to protect independent musicians, i.e. "indie artists" from unfair and corrupt practices committed by radio stations and the major record labels; the FCC has breached its duty by failing to assess penalties for payola practices and this breach of duty is both the proximate cause and causation-in-



fact of the damages (loss of pecuniary wages and loss of potential air time on the national and international radio stations) suffered by indie artists because but for this breach of duty by the FCC the indie artists would not have suffered a loss of wages and loss of radio airtime on terrestrial and satellite radio stations; internet and college radio are not dominated by corrupt cartels acting in collusion w/ one another to commit the criminal acts associated w/ payola practices (stated above). Independent artists could be seen as rival claimants in a class action whereby there is a common nucleus of operative fact w/ regards to the specific transactions and/or occurrences associated w/ payola practices that have created injury on the Plaintiff and other proposed members of an ensuing class action, i.e. "indie artists" many of whom are associated w/ the independent distributors CD Baby (in Portland, OR) or Tunecore (in Brooklyn, NY) although there are other independent distributors such as IODA Alliance, Nimbit, SongCast, the Orchard, Reverb Nation, etc.

14) The Federal Trade Commission (FTC), which is not listed as a defendant b/c it is not the agency directly responsible for assessing penalties for "payola practices", has the Bureau of Economics and Bureau of Consumer Protection to ensure that there are no monopolies in any standard industrial classification such that the economic markets remain in perfect competition which

is consistent w/ the Dormant Commerce Clause and Congress's plenary power w/regards to interstate commerce.

5.) The U.S. Dept. of Justice, which is also not named as a defendant b/c it's not the independent agency or Cabinet-level agency directly responsible for regulating "payola practices" has an Anti-trust Division to ensure that the economic markets remain in perfect competition such that there are no monopolies or oligopolies in restraint of interstate commerce.

6.) With regards to the music business and the communications industry, the Dept. of Justice Anti-Trust Division and Federal Trade Commission (FTC) both had to approve of the merger between Napster and Rhapsody (online file- and content-sharing networks in which users can download mp3's) in addition to the merger between Sirius Satellite Radio and XM Satellite Radio (formerly based at 1500 Eckington Place in NE Washington, D.C.); While the DOJ and FTC may have approved of the merger between Sirius Satellite Radio and XM, the Federal Communications Commission (FCC), i.e. the third-named defendant has been negligent for failing to assess penalties against Sirius XM for corrupt payola practices.

7.) The fourth-named defendant, Clear Channel Communications (based in San Antonio, TX) owns and operates many radio stations in the



United States, North America and the world. Clear Channel has entered into a conspiracy to commit payola practices w/ all four major record labels and may therefore be held liable for the tortious interference w/ business relations/contracts since the Plaintiff as an "indie artist" has been unable to get radio airplay on the terrestrial and satellite radio stations b/c of their practice of using "playlists" in which radio stations collude and/or enter into a conspiracy w/ the four major record labels to only play the music of artists such as Justin Timberlake, i.e. an example of an artist represented by a major record label.

18.) In essence the Plaintiff is alleging that the first defendant (Universal Music Group Inc.) has committed the acts of defamation, malicious prosecution, and the tortious interference w/ business relations and/or contracts. The second and third defendants (FCC and RIAA) have committed the act of negligence and fraud by allowing the first defendant (UMG) to enter into corrupt "payola practices" w/ radio stations and to essentially not be held responsible for their criminal acts. The fourth defendant (Clear Channel Communications should be held liable for common law fraud (by committing the acts of "payola") and for the tortious interference w/ business relations/contracts since "payola practices" have adversely affected Plaintiff who as an "indie artist" can not get a record deal from a major record label and who can not get radio airtime from any of the

commercial radio stations owned by the fourth-named defendant, i.e.
Clear Channel Communications.

## II. PARTIES

1.) Plaintiff, Ronald Satish Emrit, is a citizen of the state of Maryland but has recently moved to Providence, RI and has been added as a Section 8 tenant living w/ Nicole Rocio Leal Mendez and has officially been added by Ingrid Ostos and Kathy McKenna at the Providence Housing Authority (PHA) which provides Section 8 housing under guidelines set forth by the U.S. Dept. of Housing and Urban Development (HUD).

2.) The first defendant has its nerve center and/or principal place of business in the states of New York and California (Los Angeles) — Universal Music Group, Inc. (UMG)

3.) The second defendant has its nerve center and/or principal place of business in the municipality of Washington, D.C. (RIAA)

4.) The third defendant has its nerve center and/or principal place of business in the municipality of Washington, D.C. (FCC)

5.) The fourth defendant has its nerve center and/or principal place of business in the state of Texas (San Antonio) — Clear Channel Communications, Inc.

## III. RE-STATEMENT OF FACTS

1.) Plaintiff sent out a bulk e-mail to a group of recipients indicating that Plaintiff was the new publicist for a Dominican model named Aliky Muñoz originally from NYC but now based in Orlando, FL.

2.) One of the recipients of this bulk e-mail was a gentleman named A.J. Burton of Hope, AR who is the manager for popular R&B acts from the 1990's such as H-Town, Rome, and a new group named Signature.

3.) A.J. Burton approached the Plaintiff, Ronald Satish Emrit, about being the publicist for A.J. Burton's artist Glory of Rochester, NY who released a song called "Home With Her."

4.) Upon learning that Plaintiff was the new publicist for Fontana/Bungalow artist Glory, the director of Universal Distribution, i.e., Jim Urie, came home early from his vacation break and reprimanded A.J. Burton and Glory about the fact that they did not consult him

(Jim Urie) about the Plaintiff (Ronald Satish Emrit) being hired as the new publicist for Glory.

5.) Jim Urie and other representatives at Universal sent Kevin Flanagan by plane to issue a "cease and desist order" to Plaintiff Ronald Satish Emrit at his parents' house in Sarasota, FL (6655 38th Lane East).

6.) The Plaintiff's parents were startled that defendant corporation would infringe on their privacy rights by sending a representative to harass them w/ legal paperwork at their household (not Plaintiff's residence in Venice, FL off of Capri Isles Blvd.)

7.) Kevin Flanagan, as representative of defendant corporation, accused Plaintiff of "aggravated harassment" when in fact A.J. Burton and Glory approached Plaintiff to be publicist for Glory.

8.) By accusing Plaintiff of "aggravated harassment" and black-listing Plaintiff among all four major record labels, defendant corporation essentially defamed Plaintiff and ruined his reputation in the music business causing damages in the loss of pecuniary wages, expectation, reliance, and restitution damages and Plaintiff also seeks punitive, compensatory, actual, presumed, and treble damages

9.) As a former producer for Universal and Sony BMG, Frankie Biggz of Orlando, FL won a Grammy Award for his work with Oscar DeLeon and has also worked w/ other major record label artists such as Britney Spears, 50 Cent, Cristina Aguilera, Eminem, and Mariah Carey.

10.) Originally from Detroit, MI, Frankie Biggz has his own distribution company called Ramb Music Inc. and he supports his girlfriend on the label, i.e. Irene B, an artist who opened up for Beyonce Knowles in Spain.

11.) As a witness w/ firsthand knowledge, Frankie Biggz can confirm that there were damaging rumors going around the Universal Music Group Inc. (UMG) that Plaintiff had been black-listed at Universal based on the transaction or occurrence affiliated w/ Kevin Flanagan, Jim Urie, A.J. Burton, and Glory.

2.) Any statements and/or testimony from Frankie Biggz would be considered non-hearsay or as a hearsay exception b/c it is "legally operative language" tending to show that Ronald Satish Emrit's name had either been defamed (libel or slander) or placed in a "false light" or his name had been misappropriated and there was an invasion of Plaintiff's privacy as a dignitary tort.

3.) Any testimony by Frankie Biggz would be relevant to prove a material fact that would be more d less probable than w/o its admission and its probative value outweighs its prejudicial effect. As legally operative language, any testimony asserted by Frankie Biggz would not be considered an "out-of-court statement asserted for the truth of the matter."

4.) As the publicist for Latina pop star Jeanette Davila, Plaintiff (Ronald Satish Emrit) attempted to get a "360 record deal" for Davila to work w/ Frankie Biggz as an artist signed to the Universal Music Group (UMG)"; this deal would supposedly have a "Minimum Delivery and Release Commitment" (MDRC), a cross-collateralization clause, and controlled composition clause.

5.) As the publicist for R&B artist Natasha Jane, Plaintiff tried to get a record deal such that Natasha Jane could record an album w/ Frankie Biggz. Natasha Jane was represented by her mother as a manager w/ her company ABS Entertainment (her mother's name is Arlene B. Speller).

6.) Natasha Jane had negotiations w/ EMI (overseeing Capitol and Virgin) and her investor was named Adrian Nelson who claimed that he invested over $70,000 to get Natasha Jane on the radio and therefore Natasha Jane, Arlene B. Speller, and Adrian Nelson

may have fallen victim to a "payola scam" involving EMI in which Adrian Nelson, Natasha Jane, and Ackee B Speller may have suffered damages in excess of $70,000 since Natasha Jane's song "She Might Be" (featuring Ray-J and Maino) never became successful even though the song may have been tracked by BDS and/or Mediabase.

7.) Plaintiff's other artist, Jeanette Davila, claimed that a producer with the Defendant Universal Music Group, Inc. (UMG) may have harassed her by insisting that they have an inappropriate romantic relationship which is inconsistent w/ business practices.

8.) Jeanette Davila, who herself is from South Florida (Hialeah) claimed that Universal's producer (who harassed her by insisting on a romantic relationship) was affiliated w/ the famous rapper known by his stage name "Flo Rida."

9.) As the publicist for Jeanette Davila, Plaintiff (Ronald Satish Emrit) was able to get her on a show called Miami Vibez affiliated w/ Krib.tv, Pure Gold Entertainment, and ThaLot.com and Plaintiff introduced Davila to a potential manager named Sherry Carey who supports her husband "Golden Child" and his business partner "Matau" in their Bahamas-based business called Pure Gold Entertainment.

20.) Plaintiff also appeared as an artist performing on "Miami Vibez" w/ other artists such as Rickey Kash (affiliated w/ Cream County) and Erik Grizzly (affiliated w/ Puerto Roc Records) and his dancers were Elza Gabriel, Rie (from Japan), and Heather (affiliated w/ Cheryl Steele and the Junkyard in Hollywood, FL).

21.) Plaintiff sent Natasha Jane and Arlene B. Speller to the Grammy Awards in 2009; Plaintiff attended the Grammy Awards himself in 2010 w/ his business cohorts Ashley Boxley (who appeared as a dancer at Plaintiff's album release party in May, 2008 at the F.O.P. Lodge in Parkville, MD) and Singleton Newman (who Plaintiff met at a club called The Black Hole in Dundalk, MD); Plaintiff sent classical pianist Tania Stavreva to the Grammy Awards in 2011 in addition to Plaintiff's friends Bianca "Vosni" Ayuso and Brianna Fleury (from Chicago, IL and Wisconsin, respectively).

22.) Plaintiff maintains that he has been respectable and professional as a publicist for Natasha Jane, Aliky Muñoz, Jeanette Davila, Tania Stavreva, Ashley Boxley, and Aliky Muñoz and that defendant Universal (UMG) never should have terminated Plaintiff's employment as publicist for Glory (A.J. Burton's artist) and defendant Universal (Universal) never should have defamed Plaintiff and black-listed him by accusing him of "aggravated harassment" which may also consti-

tute grounds for a tort action for "malicious prosecution."

23) Plaintiff used to be managed by Richard Shaw of Hanover, MD) who ran a company called the Annapolis Talent Agency/Motion Pictures/Kidz in the Biz.

24) Richard Shaw claimed that he had "connections" to the co-founder of Atlantic Records and his nephew Aziz Goksel, both originally from Turkey; Richard Shaw's business partner (Anthony Wayne Sterapo) partner also claimed to be "connected" to Atlantic Records, Ahmet Ertegun (co-founder of Atlantic Records), and Aziz Goksel.

25) Plaintiff's former manager Richard Shaw also claimed to have "connections" to Halle Berry's manager Vincent Cirrincione and to Jada Pinkett-Smith (there was a picture of Richard Shaw w/ Pinkett-Smith's talent famous husband Will Smith in Richard Shaw's office in Hanover, MD).

26) Plaintiff met Ahmet Ertegun at the Grammy Awards in February, 2006 (through Plaintiff's then-publicist Tamille Hawkins) and later on in the summer of 2006, Ahmet Ertegun and his assistant Francis Chantley both called me and let me know that Ahmet Ertegun knew neither Richard Shaw nor Anthony Wayne Sterapo but that Ahmet Ertegun did receive a copy of Plaintiff's demo CD (for "La Reina

("Cabana") and that Ahmet Ertegun would give Plaintiff's demo CD to the agents and repetoires (A&R's) at Atlantic Records notwithstanding the fact that Ahmet Ertegun and apparently Aziz Goksel knew neither Richard Shaw or Anthony Wayne Sterago.

27.) Essentially, Richard Shaw and his business partner Anthony Wayne Sterago were committing civil and/or common law fraud and a prima facie case could have been established for this cause of action given the materiality and scienter on the part of Richard Shaw and Anthony Wayne Sterago in claiming that they were agents representing Atlantic Records which is a subsidiary of the Warner Music Group, Inc. (W/E/A) which is also represented by the second-named defendant, i.e. the Recording Industry Association of America (RIAA).

28.) As Halle Berry's manager, Vincent Cirrincione claimed that he only conducted one seminar instructing the clients at Richard Shaw's talent agency and that Vincent Cirrincione wanted his name removed as an affiliate of Richard Shaw and his business in Hanover, M.D (Annapolis Talent Agency/Motion Pictures/Kidz in the Biz)

29.) Plaintiff argues that the second-named defendant RIAA had either actual notice, inquiry notice or constructive notice such

that the RIAA either "knew or should have known" that Richard Shaw and Anthony Wayne Sterago were committing civil fraud by claiming that they had "~~care~~ connections" to Atlantic Records and/or the Warner Music Group (W/E/A).

30.) Because Richard Shaw and Anthony Wayne Sterago were holding themselves out to be agents of the Warner Music Group, Inc. and its subsidiary Atlantic Records, Plaintiff claims that Atlantic Records, the Warner Music Group and its fiduciary the Recording Industry Association of America (RIAA) should all be held jointly and severally liable for the torts of common law fraud and negligence since the RIAA, Warner Music Group (W/E/A), and Atlantic Records either "knew or should have known" (constructive notice) that Richard Shaw and Anthony Wayne Sterago were claiming to have the actual, apparent, express, and implied authority to bind the Warner Music Group, Inc. (W/E/A) and Atlantic Records to contract

31.) Consistent w/ the laws of agency and partnership, the RIAA, Warner Music Group (W/E/A), and Atlantic Records should be held vicariously liable (pursuant to the doctrine of respondeat superior) for the tortious actions of Richard Shaw and Anthony Wayne Sterago (unless it can be stated w/ substantial certainty that Ric Shaw and Wayne Sterago engaged in a "frolic and detour" for their actions associated w/ making fraudulent claims about their

"connections" to Atlantic Reards and the Warner Music Group, Inc. (W/E/A).

32.) In the summer of 2006 (August), a homicide investigation was commenced and led by Detective Hartsell of the Anne Arundel Criminal Investigative Division (CID) because Richard Shaw was found to have been murdered in his office by a gunshot wound to the chest.

33.) Detective Hartsell naturally wanted to question all of Ric Shaw's clients and business partners as potential suspects and therefore Detective Hartsell wanted to give Plaintiff a "polygraph test" to rule Plaintiff out as a "person of interest."

34.) Plaintiff suffered severe emotional distress as a result of being harassed by Detective Hartsell as part of this investigation, and Plaintiff holds defendant RIAA and Warner Music Group (W/E/A) and Atlantic Reards (later to be named as defendants as a joinder of indispensable and necessary parties) for the negligent infliction of emotional distress because the RIAA should have been aware of Ric Shaw's fraudulent activity and the RIAA was therefore negligent by breaching its duty to consumers to stop Ric Shaw's fraud (RIAA had constructive notice) and the RIAA, Warner Music Group, and/or Atlantic Reards should also be held responsible for the negligent

infliction of emotional distress experienced by Plaintiff b/c Plaintiff was still in the "zone of danger" (citing PaBgraf) of the RIAA's negligence such that the RIAA was both the proximate cause and causation-in-fact of Plaintiff's injuries associated w/ the negligent infliction of emotional distress, in that but for the RIAA's breach of its duty of care, the Plaintiff would not have experienced any damages.

5) The Plaintiff had to retain attorney Michael Wein, Esquire to represent him w/ regards to Detective Hartsell's polygraph test and the RIAA should be held responsible for Plaintiff's attorney's fees in conjunction w/ this case. Michael Wein, Esq. is based in Green-belt, MD and his letter to Detective Hartsell had been sent by Plaintiff to the Associated Press

6) The Plaintiff also had to get his psychiatrist Dr. Dida Ganjoo to speak w/ Detective Hartsell and the defendant RIAA should be held liable for doctor's fees in conjunction w/ the negligent infliction of emotional distress, the exacerbation of his manic depression due to this transaction or occurrence (T/O), and the ongoing post-traumatic stress syndrome that the Plaintiff experiences due to the RIAA's negligence in dealing w/ Richard Shaw, Anthony Wayne Steragg and their fraudulent claims about having connections to Atlantic Records the Warner Music Group Inc (W/E/A), Ahmet Ertegun and Aziz Goksel

# IV. RELIEF REQUESTED

WHEREFORE, Plaintiff Ronald Satish Emrit requests judgment for punitive, compensatory, treble, actual, presumed, incidental, and consequential damages associated w/ defamation, false light, invasion of privacy, misappropriation, malicious prosecution, tortious interference w/ business relations/contracts, negligence, common law fraud, and the negligent infliction of emotional distress committed by all four of the said defendants. Plaintiff seeks judgment in the amount of $10 million.

PLAINTIFF DEMANDS TRIAL BY JURY

Respectfully submitted,

Ronald Satish Emrit

Ronald Satish Emrit, pro se
976 Douglas Ave., 2nd Floor
Providence, RI  02908
Phone: (401) 272-0547
wilbyandcharlotte@gmail.com
einsteinrockstar@gmail.com